J-S41013-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: S.S.G., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: R.S.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1984 EDA 2024 |

Appeal from the Decree Entered June 27, 2024
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s): 2024-A0073

BEFORE: MURRAY, J., KING, J., and SULLIVAN, J.

MEMORANDUM BY MURRAY, J.: **FILED NOVEMBER 19, 2024**

R.S.C. (Father) appeals from the decree granting the petition filed by the Montgomery County Office of Children and Youth (OCY or the Agency), and involuntarily terminating Father's parental rights to S.S.G. (a daughter born in February 2022) (Child).[1] Upon careful review, we affirm.

The orphans' court summarized the underlying factual history:

[OCY] received a referral [concerning allegations of domestic violence] related to this family on May 10, 2022. [OCY] caseworker[, Letha Kaminski (Ms. Kaminski),] became involved and met with [M]other on that day at the Deck Motel[, a local motel that served as the family's residence. Father was not present during this initial meeting. The following day, May 11, 2022, OCY received an additional referral alleging methamphetamine use around Child.] … [Ms. Kaminski put] a safety plan in place on … May 11th, 2022. [The safety plan, agreed upon by Mother and Father, involved removing Child from

_____

[1] The orphans' court also involuntarily terminated the parental rights of B.M.G. (Mother) to Child. Mother is not a party to the instant appeal.

parents' residence.] The parents had not been able to find a family member willing to take [C]hild on that short notice, but the initial safety plan involved [placing Child with] neighbors[, Melinda Bruce and John Hrycko].

On June 21st, 2022, there was a family-group, decision-making meeting. [Ms. Kaminski] did attempt vigorously to work with this family to try to avoid court involvement for the removal of [C]hild from the home. [C]hild went to stay with an adult half-sister [(A.H.C.)] in New Jersey on June 22nd, 2022, due to the first safety plan failing.

[On] June 24th, 2022, [Mother] was no longer residing at the Deck Motel, and her whereabouts briefly were unknown. [Father continued to reside at the Deck Motel.]

On July 8th, 2022, due to [A.H.C.] not being able to continue to [care for C]hild without financial support, [OCY] took emergency custody of [C]hild, and a shelter care order was obtained on July 11th, 2022[. The orphans' court adjudicated Child dependent on July 19, 2022.] [Child] was placed [in] an OCY foster home …. From [July 8, 2022,] until [the present], [Child] has been in the same foster care placement, which is a pre-adoptive resource for [C]hild.

… [F]rom the outset, alcohol use and some drug use for [F]ather and drug use by [M]other, as well as mental health issues for both of them, and issues of domestic violence were concerns for the [A]gency. [F]ather self-reported drinking to cope with issues in his life … [Father] reported a relapse and, shortly, thereafter, went to detox for five days.

[On] October 16th, 2023, [Father] again reported that he had relapsed with alcohol …. [On] March 7th, 2024, [Father] went to detox for five days, after which he left the program against medical advice[,] as he refused to do inpatient treatment. [On] April 1st[,] 2024, [F]ather [appeared for a scheduled visit with Child] and tested positive for alcohol, cannabis and [benzodiazepines], and was denied the visit.

[On] June 5th of 2024, the last time [Father] spoke with [Ms. Kaminski] … before he moved to Texas, [Father] admitted to having a drinking problem. [Father] admitted he had been drinking in the early hours of that morning, [approximately] 2:00

or 3:00 a.m. …. [Ms. Kaminski] indicated that [Father] smelled of alcohol. … [Father] also admitted to struggling with his mental health issues and depression, and those were the reasons that he [used] alcohol. …

… [O]n several occasions[, Father] sought help for his problems, although he declined to go to any lengthy inpatient rehabilitation for drinking throughout the course of the case.

N.T., 6/27/24, at 154-57.

On May 7, 2024, OCY filed a petition to terminate the parental rights (TPR) of Father, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (8), and (b). Specifically, OCY alleged Father "refused to … meet the goals of the various Family Service Plans designed to enable reunification …, including, stabilizing mental health, submit[ting] drug screens to OCY, and maintain[ing a] safe and stable environment for Child."  TPR Petition, 5/7/24, at 7.

The matter proceeded to a hearing on June 27, 2024.  Father appeared virtually,[2] and was represented by counsel.  Child was not present, but was represented by a guardian *ad litem* (GAL), who indicated there was no conflict between Child's best and legal interests.  N.T., 6/27/24, at 7.  OCY presented the testimony of Ms. Kaminski.  Father testified on his own behalf.

Ms. Kaminski testified that the family came to OCY's attention after reports of domestic violence and substance abuse in the household.  *Id.* at 15.  Ms. Kaminski met with Father on May 11, 2022.  *Id.* at 17.  Ms. Kaminski

_____

[2] At the date of the hearing, Father had moved to Wichita Falls, Texas, with no plans to return to Pennsylvania.  N.T., 6/27/24, at 57.

administered an "instant urine screen," which returned positive results for THC, amphetamines, methamphetamines, and alcohol. *Id.* After taking Child into its custody, OCY set the following goals for Father: (1) "achieve and maintain sobriety;" (2) "stabilize his mental health;" (3) "meet financial needs;" (4) secure "stable housing for himself" and Child; and (5) "maintain contact with [Child] in foster care." *Id.* at 41.

Ms. Kaminski testified that, throughout Child's placement, Father acknowledged persistent drug and alcohol problems for which he failed to pursue treatment. *Id.* at 55. In April 2023, Father entered the Bradford Rehab Center for a five-day "detox," but failed to follow through on recommended outpatient treatment. *Id.* at 43. In March 2024, Father entered the Penn Foundation's "detox program," but refused recommended inpatient treatment. *Id.* at 45-46. Ms. Kaminski explained that "[d]ue to his alcohol abuse concerns," the orphans' court modified Father's supervised visitation with Child to require him to submit to a drug screen before any visit. *Id.* at 46; *see also* Permanency Review Order, 3/12/24. **Following this modification, Father no longer visited Child.** *See id.* at 61 (Ms. Kaminski confirming that March 4, 2024, was Father's last visit with Child). Further, Father failed to provide documentation of mental health treatment, was unemployed as of February 2024, and had been evicted from the Deck Motel in June 2024. *Id.* at 56-57.

- 4 -

Next, Father testified in opposition to the termination of his parental rights to Child. He explained that although he was unemployed, he had multiple job interviews within the next several days. *Id.* at 132-33. Father testified that he was currently staying in the living room of his sister's apartment, but stated that his relocation to Texas was beneficial, as it removed him "from a place surrounded by drug addicts and alcoholics where I'm spending half of my income … to pay the rent." *Id.* at 134, 136. Father testified he was unable to participate in a long-term alcohol treatment program, because the loss of income would cause him to lose his place of residence. *Id.* at 138.

At the conclusion of the hearing, the orphans' court terminated Father's parental rights. Father filed a timely notice of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) concise statement. The orphans' court filed a Rule 1925(a) opinion relying on the reasoning it set forth in the TPR hearing transcript.

Father raises the following issues:

1. [Whether t]he [orphans'] court erred in finding clear and convincing evidence to terminate [] Father's parental rights under 23 [Pa.C.S.A.] §[ ]2511(a)(1)[?]

2. [Whether t]he [orphans'] court erred in finding clear and convincing evidence to terminate [] Father's parental rights under 23 [Pa.C.S.A.] §[ ]2511(a)(2)[?]

3. [Whether t]he [orphans'] court erred in finding clear and convincing evidence to terminate [] Father's parental rights under 23 [Pa.C.S.A.] §[ ]2511(a)(8)[?]

4. [Whether t]he [orphans'] court erred in finding clear and convincing evidence to terminate [] Father's parental rights under 23 [Pa.C.S.A.] §[ ]2511(b)[?]

Father's Brief at 8.

We review the termination of parental rights for an abuse of discretion.

*See In the Int. of K.T.*, 296 A.3d 1085, 1104 (Pa. 2023). This standard of review requires appellate courts to

> accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> As the Pennsylvania Supreme Court discussed in *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010), there are clear reasons for applying an abuse of discretion standard of review…. Unlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Interest of K.T.*, ____ A.3d ____, 2024 PA Super 210, at \*\*8-9 (Pa. Super. filed Sept. 16, 2024) (brackets omitted) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012)).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [Section] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [Section] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Matter of Adoption of L.C.J.W.*, 311 A.3d 41, 48 (Pa. Super. 2024) (citation omitted). "The standard of 'clear and convincing' evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re Adoption of C.L.G.*, 956 A.2d 999, 1004 (Pa. Super. 2008) (*en banc*) (citation omitted). Finally, this Court need only agree with the orphans' court as to "any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order to affirm the termination of parental rights." *Int. of M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022) (citation omitted).

Instantly, we examine Father's challenge pursuant to Section 2511(a)(1), which provides:

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

- 7 -

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S.A. § 2511(a)(1).

To satisfy Section 2511(a)(1), the petitioner "must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *See In re Adoption of B.G.S.*, 245 A.3d 700, 706-07 (Pa. Super. 2021) (citation omitted); *see also In re Adoption of Charles E.D.M.*, 708 A.2d 88, 91 (Pa. 1998) ("Section 2511[(a)(1)] does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child *and* refusal or failure to perform parental duties." (citation omitted; emphasis in original)).

We have explained that in applying Section 2511(a)(1),

[t]he court should consider the entire background of the case and not simply … mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re Adoption of A.C.*, 162 A.3d 1123, 1129 (Pa. Super. 2017) (citations and paragraph break omitted). However, the General Assembly's emphasis on the six months immediately preceding the filing of the petition indicates

- 8 -

the timeframe is the "most critical period for evaluation" of a parent's conduct.

*In re Adoption of L.A.K.*, 265 A.3d 580, 592 (Pa. 2021).

Regarding the definition of "parental duties," our Supreme Court has explained:

Our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in a child's life. Fortitude is required, as **a parent must act with "reasonable firmness" to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities**.

*Id.* (citations, some quotation marks, and brackets omitted; emphasis added).

In his first issue, concerning Section 2511(a)(1), Father argues:

Throughout 2023, [Father] had been making a very solid case for reunification. From May of 2023 through September 2023, [Father] was in substantial compliance with [] OCY, his visits were consistent and appropriate[,] and his visitation reached the point where Father had one six-hour-long unsupervised visit per week. He was attending medical appointments. He was consistently employed[.] H[e] maintained residence in the same location. After an alcohol-related relapse, his compliance slipped to minimal on the [permanency review] order dated 3/12/24[,] and two months later[] OCY filed for termination. Six months had not elapsed from the time when [Father] was downgraded to minimal compliance. Father has certainly demonstrated that he is dedicated to making and maintaining a place of importance in [Child]'s life, as required by law. He had been close to reunification prior to his relapse, and OCY did not give him enough time to recover before filing. Termination under [Section 2511](a)(1) is premature.

- 9 -

Father's Brief at 14-15 (record citation omitted).

OCY counters that

[a]lthough Father only discusses his issue of substance abuse in his appeal, the record is clear that he did not meet the remaining goals necessary for him to be reunified with [C]hild. For six months prior to the TPR [petition] being filed, Father never addressed his mental health, he was unable to meet the financial needs necessary for daily living for himself and [C]hild, and he failed to maintain contact with [C]hild.

OCY Brief at 13.

At the conclusion of the TPR hearing, the orphans' court opined as follows, regarding Section 2511(a)(1):

[L]ooking at the six-month period immediately preceding the filing of the [TPR] petition, [Father has] never maintained sufficiently stable income, employment, or housing, to have a home to which [C]hild could be returned to him. [Father] continued to struggle with sobriety, all the way up until April 1st of 2024 and June 5th, 2024, even after the filing of the [TPR] petition.

....

… [A]fter having a very good record of visits with [C]hild, [Father] has fallen off and has had no additional visits since the beginning of March of 2024. That's significant because in this period of the six months preceding the filing of the [TPR] petition, he hasn't been able to maintain a stable financial situation or stable housing. He's continued to struggle with his sobriety .... And even in the last few months, from March of 2024, [Father's] visits with [C]hild ceased.

....

… Under Section 2511(a)(1), [OCY] has established that [Father] has failed or refused to perform parental duties for the six months immediately preceding [] the filing of the [TPR] petition. Although [F]ather, for the first part of those six months, tried to stay involved with [C]hild through visits, he was not

- 10 -

performing the role of a parent, providing for [C]hild[] all of her mental, emotional, physical, medical needs and welfare and providing stable housing, food, and a safe place to be for [C]hild during that six-month period. And then in the last two months of that period, he stopped visiting al[]together.

N.T., 6/27/24, at 162-65.

The orphans' court's factual findings are supported by the record, and its legal conclusion is free of legal error. *See S.P.*, 47 A.3d at 827 (stating that "an appellate court must … defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion."). Our review confirms that throughout the relevant statutory period, Father has largely failed to address his alcohol abuse, and has wholly failed to address his mental health issues or secure suitable housing for himself and Child. *Id.* at 55-56. Although Father visited Child through the beginning of March 2024, once he was required to attend visitation drug- and alcohol-free, Father no longer visited Child. *Id.* at 46, 61. Accordingly, Father's challenge to termination of his parental rights to Child, under Section 2511(a)(1), is without merit.[3]

Father next challenges termination under Section 2511(b). Father's Brief at 19. Father argues that

[a]s dedicated and heroic as foster parents are, there is simply no substitute in the foster system for the care and love of a biological

---

[3] Because we agree with the trial court that OCY met its burden with respect to Section 2511(a)(1), we need not address Father's issues two and three, which implicate other subsections of Section 2511(a). *See Int. of M.E.*, 283 A.3d at 830.

parent. There are obviously exceptions to this rule in cases of extreme abuse and neglect, but those considerations are conspicuously absent from this case. Alcoholism, although obviously a problematic and ongoing condition, is not reason enough by itself to terminate someone's parental rights. Addiction is a life-long process[,] and setbacks are normal.

Father's Brief at 19.

Child's GAL, on the contrary, argues,

[i]n this case, because of his addiction to alcohol and substances, [] Father has not seen Child for at least three months as of the day of the hearing. He ha[d] not reached out to find out about [Child's] health and welfare during that time. Prior to March of 2024, Father's visits with Child were supervised at his hotel room or the OCY offices. Father and Child had very little "parental" contact where [Father] met [Child's] basic needs and intangible needs.

[] Father failed to present any testimony whatsoever of any bond with Child. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists." *In re K.Z.S.*, 946 A.2d 753[, 762-63] (Pa. Super. 2008). Without any contradiction, prospective adoptive parents have tended to all of Child's needs. Since she was four and one-half (4½) months old, [foster parents] have given [Child] love, stability, and a nurturing environment to thrive.

GAL's Brief at 37.

When the trial court finds grounds for termination under Section 2511(a), it must separately consider a child's needs and welfare:

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. ….

23 Pa.C.S.A. § 2511(b).

- 12 -

"Notably, courts should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent." ***K.T.***, 296 A.3d at 1105. Courts must also "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." ***Id.*** (citation omitted). However, "the parental bond is but one part of the overall subsection (b) analysis." ***Id.*** at 1113.

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care …; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.

***Id.*** (footnote and citations omitted); ***see also In re T.S.M.***, 71 A.3d 251, 269 (Pa. 2013) (stating that "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly.").

Here, the orphans' court explained as follows, concerning Section 2511(b):

> [F]ather was not typically in a day-to-day parental role with [C]hild, and visits ceased in March of 2024…. [Father has] not been able to sustain meaningful parental visits, and [a] relationship with [C]hild, who is now almost two and a half years old.
>
> [Ms. Kaminski] also testified that [C]hild is not only safe in the current placement where she is, which is a pre-adoptive home, but she is bonded and secure. [Child] goes to the foster mother and foster father to have her needs met and for comfort and

security[;] she plays readily[;] she appears to be happy, safe, and secure in the environment where she is.

Fundamentally, [C]hild's emotional needs and welfare are being met in the foster home …. [T]his is the only home she's known since July 8th, 2022, which is quite a lengthy period of time for an almost two-and-a-half[-]year[-]old. … [The orphans' court] find[s] that there will not be a significant emotional detriment to [C]hild by termination of [Father's] parental rights[,] as in this case the visits have already stopped happening[.] [T]his [c]ourt will not be imposing a new rupture on [C]hild[,] but rather[,] terminating rights of [a] parent[] who [is] currently absent from [C]hild's life.

N.T., 6/27/24, at 168-70 (some paragraph breaks omitted).

We agree with the reasoning and conclusion of the orphans' court, as it is supported by the record and free of legal error. At the time of the TPR hearing, Father had not visited Child in nearly four months. Conversely, Child has been in the care of foster parents since July 8, 2022, and Ms. Kaminski testified that Child and foster parents share a beneficial bond. *See* N.T., 6/27/24, at 62 (Ms. Kaminski testifying that Child "definitely looks [to foster parents] for comfort, nurturing."); *see also id.* at 66 (Ms. Kaminski agreeing that Child would not be "irreparably harmed if parental rights between [F]ather and [Child] are terminated"). As we have previously observed, a "court cannot and will not subordinate indefinitely a child's need for permanence and stability to the parent's claim to progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). Accordingly, Father's final claim warrants no relief.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/19/2024